IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

RUDOLPH ROSSI,

                    Plaintiff,

          vs.                              Civil Action No.
                                           9:00-CV-1521 (LEK/DEP)
GLENN GOORD, Commissioner of the
Department of Correctional Services, *et al.*,

                    Defendants.

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

RUDOLPH ROSSI, *et al.*

FOR DEFENDANT:

OFFICE OF ATTORNEY GENERAL    DAVID L. COCHRAN, ESQ.
HON. ELIOT SPITZER            Assistant Attorney General
Attorney General of the
State of New York
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Rudolph Rossi, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 claiming to have experienced various constitutional deprivations while confined within the Shawangunk Correctional Facility ("Shawangunk").  The claims raised in plaintiff's complaint can be loosely grouped into three general categories, involving 1) placement on Tuberculosis ("TB") hold for 365 days in 1998, based upon his refusal to be tested for the disease; 2) seven disciplinary hearings conducted in late 1998 and early 1999, as well as the issuance of additional misbehavior reports which were not the subject of disciplinary proceedings; and 3) an alleged assault by corrections officers and the later confiscation of his medical boots allegedly utilized by him to kick a corrections worker.  Plaintiff's complaint seeks recovery of compensatory and punitive damages.

Currently pending before the court is a motion by the defendants seeking the entry of partial summary judgment dismissing certain of plaintiff's remaining claims on the merits.[1]  For the reasons set forth

---

[1]  As will be seen, certain of the claims contained in plaintiff's complaint were previously dismissed by the court.  *See* pp. 15-16, *post.*

2

below, I recommend that defendants' motion be granted.

I.      BACKGROUND

Plaintiff is a New York State prison inmate entrusted to the custody of New York State Department of Correctional Services ("DOCS").  At the times relevant to his claims, plaintiff was incarcerated at Shawangunk. Plaintiff's complaint, which is both lengthy and comprehensive, asserts an amalgamation of claims addressing various conditions and occurrences falling into three broad categories.

A.      TB Testing and Medical Keeplock Confinement

One aspect of plaintiff's complaint centers upon efforts by the DOCS to test him for TB.  Plaintiff alleges that in 1997 defendant Patricia Buttersworth, a prison nurse, forcibly administered a TB test, over his objection.  Complaint (Dkt. No. 1) ¶¶ 22-31.  Rossi's refusal during the following year to submit to another TB test resulted in his confinement on TB hold in medical keeplock confinement for a period of one year, beginning on October 10, 1998.  Complaint (Dkt. No. 1) ¶¶ 32-38.

The efforts of prison officials to test Rossi for TB were governed by DOCS Policy No. 1.18.  *See* Nepveu Decl. (Dkt. No. 97) Exh. A.  Under that policy, New York State prison inmates must be screened for the

3

presence of TB reactivity upon entry into DOCS custody, and at least annually thereafter.  See *id.*, at 4.  The policy further provides for inmates refusing to submit to testing to be placed upon TB hold for one year, and thereafter released unrestricted into the general prison population if no signs or symptoms of TB develop and the inmate has had three negative chest x-rays.  *Id.*, at 5.  Inmates on medical hold are required to remain in their cells at all times except for one hour of recreation each day and three showers per week, and additionally are limited to only legal visits.[2] Nepveu Decl. (Dkt. No. 97) Exh. A, at 5.

On November 3, 1998, while Rossi remained on TB hold, DOCS officials became aware that he was being taken from his cell for purposes of a scheduled dental appointment.  Nepveu Decl. (Dkt. No. 97) Exh. N. After determining that the appointment was for routine teeth cleaning only, with no immediate need for care or treatment, L. Barringer, a nurse at the facility, cancelled the scheduled visit and ordered Rossi to be returned to his cell, believing her directive to be in accordance with the DOCS TB hold policy.  *Id.*; *see also* Complaint (Dkt. No. 1) ¶¶ 60-65.

---

[2]     The circumstances leading up to the DOCS' enactment of the policy for comprehensive testing and treatment of TB are ably recounted by Magistrate Judge Naomi Reice Buchwald in *Johnson v. Keane*, No. 92 Civ. 4287, 1993 U.S. Dist. LEXIS 19292 (S.D.N.Y. May 3, 1993).

B.    Misbehavior Reports and Disciplinary Proceedings

On October 14, 1998 plaintiff was issued an inmate misbehavior report alleging his refusal to obey a direct order, in violation of Inmate Disciplinary Rule 106.10.  Nepveu Decl. (Dkt. No. 97) Exh. B.  That misbehavior report, authored by Corrections Officer G. Warner, was based upon plaintiff's failure to promptly comply with an order, given initially by Corrections Officer Warner and later reiterated by Sergeant Duffany, that he collect his belongings and move to another housing location within the same correctional facility.  *Id.*; *see also* Complaint (Dkt. No. 1) ¶¶ 55-56.  Following a disciplinary hearing conducted October 19, 1999 by Corrections Lieutenant John O'Rourke regarding the matter, plaintiff was found guilty of the disciplinary violations charged, resulting in a sanction of thirty days of keeplock confinement with a corresponding loss of package, commissary and telephone privileges.[3,4]  Nepveu Decl.

---

[3]      Plaintiff's complaint also alleges that the hearing disposition resulted in the confiscation of monies from his prison account.  Complaint (Dkt. No. 1) ¶ 58.

[4]      Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and denying or limiting the prisoner's participation in normal prison activities.  *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *Tinsley v. Greene*, No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia*, *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)).  Inmate conditions while keeplocked are substantially the same as in the general population.  *Lee v. Coughlin*, 26 F. Supp.2d 615, 628 (S.D.N.Y. 1998) (citing *Camacho v. Keane*, No. 95 CIV. 0182, 1996 WL 204483, at *2 (S.D.N.Y. Apr. 25,

(Dkt. No. 97) Exh. B; Complaint (Dkt. No. 1) ¶ 57.  An appeal of that determination to facility Superintendent Leonard Portuondo was denied.[5] Complaint (Dkt. No. 1) ¶ 59.

Plaintiff was issued another misbehavior report on or about January 8, 1999, charging him with littering (Rule 118.25) and causing property damage or loss (Rule 116.10).  Nepveu Decl. (Dkt. No. 97) Exh. C (Rossi Affidavit in Support of Order to Show Cause) ¶ 5.  Those disciplinary charges stemmed from an incident during which plaintiff allegedly threw a food tray out of his cell and into the gallery.  *Id.*  A Tier II hearing was subsequently conducted on January 12, 1999 to address those allegations, apparently in plaintiff's absence, at the conclusion of which he was found guilty of the violations charged, resulting in a disciplinary

---

1996) and *Gayle v. Keane*, No. 94 CIV. 7583, 1998 WL 187862, at *4 (S.D.N.Y. Apr. 21, 1998)).  Those conditions include confinement to the inmate's general population cell for twenty-three hours a day, with one hour for exercise.  *Id.*  Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals.  *Id.*  The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends.  *Id.*

[5]     In their motion, defendants assert that the October 19, 1998 hearing result was later administratively reversed.  *See* Defendants' Memorandum (Dkt. No. 97) at 2, n. 3.  No additional information is found in the record, however, regarding that reversal.

sanction which is not specified in the record.[6,7]  Complaint (Dkt. No. 1) ¶¶
69-72.  The hearing officer's findings and resulting penalty were affirmed
on appeal to the facility superintendent, and in a subsequent proceeding
commenced by the plaintiff under Article 78 of the New York Civil Practice
Law and Rules ("CPLR").  Nepveu Decl. (Dkt. No. 97) Exh. C (Rossi
Affidavit in Support of Order to Show Cause) ¶ 5; *id.* Exh. D (Answer to
Order to Show Cause) ¶ 4; *id.* Exh. E; *Rossi v. Portuondo*, 275 A.D.2d
823, 713 N.Y.S.2d 97 (3d Dept. 2000), *leave to appeal denied*, 96 N.Y.2d
703, 745 N.E.2d 1017, 722 N.Y.S.2d 795 (2001).

Plaintiff was issued another misbehavior report, authored by
Corrections Officer L. Mazzella, on or about January 16, 1999, accusing
him of assaulting a fellow inmate, in violation of Rule 100.10.  Nepveu
Decl. (Dkt. No. 97) Exh. F.  That charge resulted from an incident which

---

[6]      The DOCS conducts three types of inmate disciplinary hearings.  Tier I
hearings address the least serious infractions, and can result in minor punishments
such as the loss of recreation privileges.  Tier II hearings involve more serious
infractions, and can result in penalties which include confinement for a period of time
in the Special Housing Unit ("SHU").  Tier III hearings concern the most serious
violations, and could result in unlimited SHU confinement and the loss of "good time"
credits.  *See Hynes v. Squillace*, 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S.
907, 119 S. Ct. 246 (1998).

[7]      Plaintiff's complaint alleges that this hearing disposition also resulted in
the confiscation of monies from his prison account.  *See* Complaint (Dkt. No. 1) ¶ 70.

occurred that day in a housing television viewing area. *See id.* A Tier III

disciplinary hearing was conducted to address that misbehavior report,

beginning on January 22, 1999, by the Shawangunk Deputy

Superintendent of Programs, Jimmy Harris. Nepveu Decl. (Dkt. No. 97)

Exh. G; *see also* Complaint (Dkt. No. 1) ¶¶ 78-80. At the close of that

hearing plaintiff was found guilty, and a penalty of 120 days of disciplinary

special housing unit ("SHU") confinement, with a corresponding loss of

privileges, as well as a recommended four month loss of good time

credits, was imposed. Nepveu Decl. (Dkt. No. 97) Exh. F. Those findings

were later administratively reversed on June 1, 2000 by Donald Selsky,

the DOCS Director of Special Housing/Inmate Discipline, based upon the

failure of prison officials to properly document a requested witness's

refusal to testify at the hearing. *Id.* Exh. H; *see also Rossi*, 275 A.D.2d at

823, 713 N.Y.S.2d at 97-98.

On or about March 2, 1999 plaintiff was issued a misbehavior report

by Corrections Officer Coran, in essence charging him with failure to

return supplies provided for use in cleaning his cell. Complaint (Dkt. No.

1) ¶¶ 94-96. That misbehavior report appears to have grown out of a

disagreement between plaintiff and Corrections Officer Coran over

whether Rossi had been provided with clean water for purposes of carrying out the assigned task. *Id.* Following a disciplinary hearing conducted by Senior Corrections Counselor Robert Cunningham, plaintiff was found guilty of the charges set forth in that misbehavior report. *Id.* ¶ 97. Although the record is somewhat unclear as to the sanction imposed, it appears that once again plaintiff was fined, and monies were transferred from his prison account for the violation, and that plaintiff may also have suffered the loss of commissary, package and telephone privileges for thirty days. *Id.*; *see also* Nepveu Decl. (Dkt. No. 97) Exh. J (Plaintiff's Application for Order to Show Cause) ¶ 1. An internal, administrative appeal to Commissioner Goord from that determination was denied. Complaint (Dkt. No. 1) ¶ 98. Plaintiff's judicial challenge of that determination under Article 78 of the CPLR was similarly rejected. *Rossi v. Portuondo*, 277 A.D.2d 615, 615-16, 716 N.Y.S.2d 116, 117-18 (3d Dept. 2000).

Plaintiff was again administered an inmate misbehavior report on March 5, 1999, this one authored by Corrections Sergeant W. Lutz, charging him with refusal to obey a direct order (Rule 106.10), engaging in violent conduct (Rule 104.11) and disorderly conduct (Rule 104.13).

9

Nepveu Decl. (Dkt. No. 97) Exh. I.  The genesis of that misbehavior report was plaintiff's refusal to cooperate with an extraction from his SHU cell for purposes of a routine cell search.  *Id.*; *see also* Complaint (Dkt. No. 1) ¶ 100.  At the conclusion of a hearing conducted by Deputy Superintendent Harris on March 16, 1999 to address those allegations, plaintiff was acquitted of engaging in violent conduct and creating a disturbance, but found guilty of refusal to obey a direct order.  Nepveu Decl. (Dkt. No. 96) Exh. I.  As a penalty, Deputy Superintendent Harris imposed thirty days of disciplinary keeplock confinement with a corresponding loss of package, commissary and telephone privileges and a surcharge from plaintiff's inmate account in an unspecified amount.  Complaint (Dkt. No. 1) ¶ 102; Nepveu Decl. (Dkt. No. 96) Exh. I.  Although the record does not firmly establish as much, it appears that plaintiff appealed the results of that disciplinary hearing internally, without success.  *See* Nepveu Decl. (Dkt. No 97) Exh. J (Rossi Affidavit in Support of Order to Show Cause) ¶ 22.  A judicial challenge to that determination brought by the petitioner under CPLR Article 78 resulted in confirmation of the hearing officer's determination.[8]  *Rossi*, 277 A.D.2d at 615-16, 716 N.Y.S.2d at 117-18;

_____

   [8]   A brief submitted on behalf of Superintendent Portuondo in response to plaintiff's Article 78 petition challenging that determination, among others, suggests

*see also* Nepveu Decl. (Dkt. No. 97) Exhs. J-L.

On March 24, 1999 plaintiff was issued a misbehavior report accusing him of harassment (Rule 107.11).  Complaint (Dkt. No. 1) ¶ 106; Nepveu Decl. (Dkt. No. 97) Exh. L, at 9.  That report, authored by Corrections Officer McGuire, accused plaintiff of making inappropriate comments toward him.  *Id.*  A Tier II disciplinary hearing was conducted regarding those allegations, commencing on March 31, 1999, during which Rossi argued that the misbehavior report had been administered in retaliation for his having lodged complaints against Corrections Officer McGuire.  Nepveu Decl. (Dkt. No. 97) Exh. L, at 10.  On April 2, 1999, at the close of the hearing, plaintiff was found guilty of the charges set forth in that misbehavior report, and a sanction which included fifteen days of disciplinary keeplock confinement was imposed.  *Id.*, at 12.  That determination was affirmed both upon internal, administrative review, *see id.*, and on Article 78 challenge into the courts.  *Rossi*, 277 A.D.2d at 615-16, 716 N.Y.S.2d at 117-18; *see also* Complaint (Dkt No. 1) ¶¶ 107-08.

Plaintiff was issued two separate misbehavior reports on April 2, 1999.  Nepveu Decl. (Dkt. No. 97) Exh. L, at 12.  In the first, Rossi was

_____

that Rossi did not appeal the hearing officer's findings.  *See* Nepveu Decl. (Dkt. No. 97) Exh. L, at 27.

accused by Corrections Officer McGuire of assault on staff (Rule 100.11),
refusal to obey a direct order (Rule 106.10) and harassment (Rule
107.11).  *Id.*  The second, also written by Corrections Officer McGuire,
charged Rossi with assault on staff (Rule 100.11) and interference with an
employee (Rule 107.10).  *Id.*  A combined hearing to address those two
misbehavior reports was conducted, beginning on April 13, 1999, with
defendant Cunningham presiding.  *Id.*, at 13-21.  At the close of those
proceedings the hearing officer found Rossi guilty of two counts of assault
on staff, harassment, refusal to obey a direct order, and interference with
an employee, and imposed a total of 730 days of SHU disciplinary
confinement, with a corresponding loss of package, telephone and
commissary privileges.  *Id.*, at 21.  That determination was upheld on
administrative review, *see id.*, and following Rossi's Article 78 challenge
into the courts.  *Rossi*, 277 A.D.2d at 615-16, 716 N.Y.2d at 117-18.

       In addition to these disciplinary charges and resulting hearings,
plaintiff's complaint references two allegedly false misbehavior reports
issued by Corrections Officer McGuire on unspecified dates, relating to
his alleged failure to return cleaning supplies and flooding of his cell,
asserting that both of those accusatory instruments were ultimately

dismissed.  Complaint (Dkt. No. 1) ¶ 85.  Plaintiff's complaint also
references a misbehavior report issued sometime after November 3,
1998, based upon Rossi's alleged refusal to provide a urine sample, and
additionally another charge lodged on or about May 26, 1999, alleging
Rossi's failure to return handcuffs to prison authorities.[9]  Complaint (Dkt.
No. 1) ¶¶ 67, 137.

### 3.   Miscellaneous Claims

In addition to complaining of his keeplock confinement while on
medical hold and the various disciplinary proceedings against him,
plaintiff's complaint asserts a series of claims addressing the conditions of
his confinement at the relevant times.  Those claims include those
stemming from the denial of dental treatment on November 3, 1999, which
was addressed above.[10]  Complaint (Dkt. No. 1) ¶¶ 62-65.  Plaintiff also
alleges in part two of his complaint a claim which is more closely aligned
with the various prison condition assertions included in part three, relating
to an incident on April 2, 1999 when his food was allegedly tampered with,
causing him to become ill and leading to his refusal to eat between April

---

[9]     Plaintiff does not identify the author of those two reports, nor does he
appear to be asserting any procedural due process claims relating to their issuance
and any disciplinary hearings which may have followed.

[10]    *See* p.4, *ante.*

5, 1999 and May 10, 1999.  Complaint (Dkt. No. 1) ¶¶ 117, 130-33, 136.

In part three of his complaint, plaintiff alleges that he was verbally abused and harassed by Corrections Officers Freer and Rankin in July of 1999, and ultimately assaulted by those officers, acting in concert with Corrections Sergeant Kobelt, who refused to intercede on his behalf. Complaint (Dkt. No. 1) ¶¶ 152-74.  That incident led to the issuance by Corrections Officer Freer on July 4, 1999 of a misbehavior report accusing Rossi of assault on a staff member (Rule 100.11) – a charge which plaintiff maintains was fabricated in order to "cover-up" the officers' assault on him.  Nepveu Decl. (Dkt. No. 97) Exh. P; Complaint (Dkt. No. 1) ¶ 164.  A Tier III hearing was subsequently conducted, beginning on July 15, 1999 and continuing to July 29, 1999, by Corrections Captain K. Decker to address those charges.  Nepveu Decl. (Dkt. No. 97) Exhs. P & Q.  At the close of the hearing plaintiff was found guilty of the charge set forth in the misbehavior report and directed to serve six months of disciplinary SHU confinement.  *Id.* Exh. P.  On October 14, 1999, that determination was affirmed on appeal to Donald Selsky.  *Id.* Exh. R; *see also* Complaint (Dkt. No. 1) ¶ 170.

In addition to complaining of the issuance of the false misbehavior

14

report and the resulting disciplinary confinement, plaintiff also alleges that

as a direct result of the July, 1999 incident his medical boots were

confiscated, causing "significant pain to plaintiff's feet, ankles and knees

and a denial of medical treatment prescribed by a doctor."  Complaint

(Dkt. No. 1) ¶ 171.  A grievance filed by the plaintiff seeking redress for

the deprivation of his boots was denied, both at the facility level and by

the Central Office Review Committee ("CORC"), based upon the lack of

any showing of medical necessity and the fact that plaintiff was provided

with adequate, substitute orthotics for his boots and sneakers.  Nepveu

Decl. (Dkt. No. 97) Exh. S.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on October 5, 2000.  Dkt. No. 1.

Named as defendants in plaintiff's complaint are Glenn Goord,

Commissioner of the DOCS, as well as Shawangunk Superintendent

Leonard Portuondo and several other corrections workers employed at

the facility.  Plaintiff's complaint alleges causes of action for violation of

his First Amendment free religious exercise right, excessive use of force,

denial of procedural due process, deliberate indifference to his medical

needs, cruel and unusual punishment, and unlawful retaliation.

On October 24, 2002 plaintiff moved seeking the entry of summary judgment with respect to his TB testing claims.  Dkt. Nos. 57-60. Defendants both opposed plaintiff's motion and cross-moved for partial summary judgment with regard principally to the TB testing claims set forth in the first portion of Rossi's complaint.  Dkt. Nos. 66-69.  As a result of the issuance by me on October 24, 2003 of a report and recommendation, Dkt. No. 78, and its subsequent adoption by District Judge Lawrence E. Kahn on January 20, 2004, Dkt. No. 83, plaintiff's motion for summary judgment was denied, and defendants' cross-motion for summary judgment was granted in part, leading to dismissal of portions of plaintiff's TB hold claims.  Those determinations left intact, however, the portion of plaintiff's TB hold claim alleging deprivation of procedural due process based upon the 360 days spent by him on TB hold.  *See id.*  Included among the claims dismissed by the court were plaintiff's excessive force cause of action stemming from the forcible administering of TB testing by Nurse Buttersworth, as well as companion tort claims, which were dismissed under N.Y. Correction Law § 24. Plaintiff's claim for compensatory damages on the causes of action set forth in the first portion of his complaint were also dismissed based upon

16

his failure to plead and prove the existence of physical injury, as required

under 42 U.S.C. § 1997e(e).  Plaintiff's First Amendment free exercise

claim, stemming from the forcible administration of TB testing and his

medical keeplock confinement in 1998, was also dismissed based upon

the preclusive effects of an earlier, unsuccessful state court challenge to

those determinations, and on the basis of qualified immunity.[11]  *See Rossi

v. Portuondo*, 277 A.D.2d 526, 714 N.Y.S.2d 816 (3d Dept. 2000).

By motion filed on February 1, 2005, defendants now move for the

entry of partial summary judgment dismissing portions of the remaining

claims contained in plaintiff's complaint.  Dkt. No. 97.  In their motion, *inter

alia*, defendants seek dismissal of 1) plaintiff's procedural due process

claims, relating to the time spent by Rossi in TB testing isolation, based

upon the fact that he was provided notice and an opportunity to be heard

regarding his recourse, and additionally on the ground of qualified

immunity; 2) plaintiff's procedural due process claims related to various

disciplinary proceedings referenced in his complaint, based upon Rossi's

---

[11]     An earlier report and recommendation was issued by me on November 13, 2002, Dkt. No. 64, and adopted by District Judge Lawrence E. Kahn on December 18, 2002, Dkt. No. 71, denying a motion by the defendants seeking dismissal of plaintiff's complaint based upon its length and degree of detail, pursuant to Rule 8 of the Federal Rules of Civil Procedure.

17

failure to show the deprivation of a constitutionally cognizable liberty interest and a due process deprivation associated with the denial in certain instances, as well as on the grounds of collateral estoppel and qualified immunity; 3) plaintiff's medical indifference claims, based upon the lack of a showing of any serious medical need as relates to the deprivation of his medical boots; and 4) plaintiff's claims against Commissioner Goord, based upon the lack of his personal involvement in the various constitutional violations alleged in plaintiff's complaint.  Dkt. No. 100.  By opposition filed on April 11, 2005, plaintiff has since responded to that motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

     A.   Summary Judgment Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n. 4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

B.    TB Hold Procedural Due Process Claims

_____Plaintiff's complaint alleges that as a result of his refusal to submit to purified protein derivative ("PPD") testing for TB in October of 1998 he was placed in medical keeplock for one year.  Complaint (Dkt. No. 1) ¶¶ 32-41.  Plaintiff contends that the restrictions placed upon him while in keeplock confinement represent sufficiently significant departures from those placed upon prison inmates generally as to result in the deprivation of a constitutionally cognizable liberty interest.  Plaintiff maintains that the liberty interest deprivation was imposed without adequate safeguards, in contravention of his procedural due process right enjoyed under the Fourteenth Amendment.

In their motion defendants assume, for purposes of argument, that if the TB hold confinement represented the deprivation of a constitutionally significant liberty interest, but assert that the strictures of the Fourteenth Amendment were satisfied since plaintiff was given notice of the reasons for the confinement and an opportunity to be heard.  Defendants further maintain that in any event, they are entitled to dismissal of this claim on the basis of qualified immunity, arguing that in 1998 the law surrounding the various legal implications of the DOCS TB testing policy was

unsettled.

The concept of procedural due process under the Fourteenth Amendment is a flexible one, with its requirements being dependent upon the nature of the deprivation at issue and the process associated with it. In a prison setting, an inmate who is subject to the deprivation of a constitutionally significant liberty interest is entitled under the Fourteenth Amendment to notice and an opportunity to be heard.  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191 (1965)).

Like the defendants, I will assume for the sake of argument that plaintiff's medical keeplock confinement for a period of one year, with a corresponding loss of privileges, constituted the deprivation of a liberty interest sufficient to trigger the Fourteenth Amendment's due process protections.[12]  Plaintiff was therefore entitled to both notice and a

---

[12]     While some courts have analyzed procedural due process claims stemming from keeplock confinement under principles ordinarily applicable to disciplinary or administrative SHU confinement, *e.g., Delisser v. Goord*, No. 9:02-CV-0073, 2003 WL 133271, at *7 (N.D.N.Y. Jan. 15, 2003), others have concluded that

meaningful opportunity to be heard with regard to that deprivation. *Sira*, 380 F.3d at 69.

Under DOCS Policy No. 1.18, before being placed in keeplock confinement for refusing to be tested for TB, an inmate must "be carefully counseled about the importance of [the] test." Nepveu Decl. (Dkt. No. 97) Exh. A, at 4. The policy also requires that inmates on TB hold be offered testing "daily for one week, weekly for one month and monthly thereafter until the inmate accepts testing or prophylaxis" going on to provide that "[i]nmates can agree to testing/prophylaxis at any time." *Id.*, at 5. Accordingly, assuming the validity of DOCS Policy No. 1.18 – a matter determined by the state courts in response to plaintiff's challenge of the policy (*Rossi v. Portuondo*, 277 A.D.2d 526, 714 N.Y.S.2d 816 (3d Dept. 2000) – the requirements of due process were met, in that plaintiff had both notice of the reason for his keeplock confinement and the means of ending it. Under these circumstances, no reasonable factfinder could conclude that plaintiff was denied procedural due process in connection with its medical keeplock confinement. Accordingly, I recommend

---

ordinary keeplock confinement conditions are not sufficiently atypical or significant hardships in relation to the ordinary incidents of prison life to trigger the protections of the Fourteenth Amendment. *See*, *e.g.*, *Luis v. Coughlin*, 935 F.Supp. 218, 220-22 (W.D.N.Y. 1996).

dismissal of plaintiff's remaining claims associated with the TB testing.[13]

> C.    Misbehavior Report and Disciplinary Hearing Claims

Defendants' summary judgment motion seeks dismissal of the majority of plaintiff's claims arising from the issuance of misbehavior reports and resulting disciplinary proceedings on several bases.

> 1.    Governing Legal Principles

Before addressing the merits of plaintiff's claims surrounding the various misbehavior reports and resulting disciplinary hearings, it is useful to discuss the legal principles associated with those claims, and against which they must be judged.  To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process.  *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

---

[13]    In light of my recommendation on the merits, I have not addressed qualified immunity.  *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156 (2001); *Harhay v. Town of Ellington Bd. of Ed.*, 323 F.3d 206, 211 (2d Cir. 2003); *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir. 1996)).

In *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S. Ct. at 2300; *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor (*see*, *e.g.*, *LaBounty v. Coombe*, No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)), the question of whether a constitutionally significant deprivation is implicated in connection with one or more of plaintiff's disciplinary hearings is dependent upon whether he suffered conditions rising to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[14]  *Colon*

---

[14]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those

*v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).  When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement.  *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335-36 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997).  In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[15] *Hynes*, 143 F.3d at 658; *Arce*, 139 F.3d at 336.  In the event a constitutionally significant deprivation is found to have occurred, the court's focus must then shift to whether, in connection with that

_____

disputes to a jury for resolution.  *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

[15]      While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin*.  *Colon*, 215 F.3d at 231.  Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n.5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not.  *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure).  In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

deprivation, the plaintiff received the constitutionally mandated safeguards to which he was entitled.

The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the applicable requirements having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, an inmate facing the deprivation of a liberty interest as a result of disciplinary proceedings, while not deserving of "the full panoply of rights" due to a criminal defendant, must be afforded 1) advance written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a fair and impartial hearing officer; 4) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 5) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-67, 94 S. Ct. at 2978-80; *see also Sira*, 380 F.3d at 69 (citing *Wolff*); *Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In the event that these requirements are satisfied, and the resulting disposition is supported by "some evidence" – a standard which

has been described as "extremely tolerant" – an inmate has been afforded

due process.  *Sira*, 380 F.3d at 69 (citing *Superintendent v. Hill*, 472 U.S.

445, 455, 105 S. Ct. 2768, 2774 (1985)).

### 2.   October 19, 1998 Hearing

Plaintiff's claims surrounding the October 19, 1998 hearing and

underlying misbehavior report, issued on October 14, 1998, are two-

pronged.  Plaintiff asserts that the misbehavior report was false, and

additionally alleges a deprivation of procedural due process associated

with the resulting hearing.

The first portion of plaintiff's complaint regarding the October 19,

1998 hearing is easily dispensed with.  It is well-established that a

prisoner has no constitutional right against the issuance of a false

misbehavior report, provided that the requisite due process is provided

with regard to that report.[16] *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d

---

[16]   A false misbehavior report issued in retaliation for a prisoner having
engaged in protected activity, such as the commencement of litigation or the filing of
grievances, can be independently actionable as unlawful retaliation under the First
Amendment. *Davidson v. Goord*, No. 99-CV-555, 2000 WL 33147399, at *10-*11
(W.D.N.Y. Sept. 27, 2000) (citing *Franco v. Kelly*, 854 F.2d 584, 587-89 (2d Cir.
1988)).  From his opposition papers, plaintiff appears to advance such a claim with
regard to the October 19, 1998 hearing, asserting that issuance of the disciplinary
charge was motivated by his questioning of an order given by prison authorities.  The
questioning by an inmate of a lawful order given by a corrections officer, however,
does not constitute protected speech deserving of First Amendment protection. *See*
*Rodriguez v. Phillips*, 66 F.3d 470, 478-79 (2d Cir. 1995).

Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S. Ct. 1273 (1988)); *Franco v. Kelly*, 854 F.2d 584, 587-89 (2d Cir. 1988).

The remaining focus of plaintiff's claims related to the October, 1998 hearing surround his contention that his due process rights were violated in connection with that proceeding.  From the record, however, it appears that the penalty associated with that hearing and the resulting finding of guilt was limited to thirty days of keeplock confinement, with a corresponding loss of privileges.  *See* Nepveu Decl. (Dkt. No. 97) Exh. B. Under settled due process jurisprudence, including *Sandin* and its progeny, a thirty day period of keeplock confinement does not constitute a liberty interest deprivation sufficient to trigger the Fourteenth Amendment's due process protections.  *Moore v. Senkowski*, No. 93-CV-1052, 1996 WL 191988, at *1-*3 (N.D.N.Y. Apr. 15, 1996) (Pooler, J.).  I therefore recommend that all claims associated with the October 19, 1998 hearing be dismissed as a matter of law.

        3.    <u>Disciplinary Hearings Conducted On January 12, 1999, March 15, 1999, March 16, 1999, April 2, 1999 and April 20, 1999</u>

Defendants next seek dismissal of plaintiff's claims surrounding

each of the five disciplinary hearings referenced above, arguing that they are precluded by collateral estoppel, based upon the unfavorable state court decisions issued in Rossi's Article 78 proceedings challenging those determinations.

The Second Circuit has provided useful guidance concerning the preclusive effects to be given to prior judicial determinations involving the same subject matter as is presented in the case under consideration. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002). In *Marvel*, the Second Circuit noted that state law governs the preclusive effect to be given to a state court determination. 310 F.3d at 286. The Full Faith and Credit Clause requires that a federal court give the same preclusive effect to a state judgment as would be ascribed by that state court. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984) (citing *Allen v. McCurry*, 449 U.S. 90, 96, 101 S. Ct. 411, 415 (1980)). The court in *Marvel* went on to note, however, that "there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel." *Marvel*, 310 F.3d at 286 (citing *Pike v. Freeman*, 266 F.3d 78, 90 n.14 (2d Cir. 2001)).

As the Second Circuit explained in *Marvel*, claim preclusion – often

30

referred to as res judicata – requires that a final judgment on the merits of an action be given preclusive effect, barring parties as well as those in privity with them from relitigating claims that were or could have been raised in the prior action. *Marvel*, 310 F.3d at 286-87; *see also Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21, 28 (2d Cir. 1986) (citing, *inter alia*, *Migra*), *overruled on other grounds*, *Taylor v. Vermont Dep't of Ed.*, 313 F.3d 768 (2d Cir. 2002).

In this case it is clear, based upon well-established case authority, that the prior unfavorable Article 78 determinations did not foreclose the plaintiff from commencing this subsequent section 1983 action for damages, since damages are unavailable to compensate a party in an Article 78 proceeding for civil rights violations. *Davidson v. Capuano*, 792 F.2d 275, 278-80 (2d Cir. 1986). Accordingly, plaintiff's claims for damages in this section 1983 action are not barred by the prior Article 78 proceeding, even assuming that all of the other requirements for claim preclusion can be met.

This finding, however, does not end the inquiry. Under the doctrine of issue preclusion, often referred to as collateral estoppel, a party that has had a full and fair opportunity to litigate an issue of fact or law may be

31

precluded from relitigating the issue once it has been decided against the party or its privy. *Marvel*, 310 F.3d at 288-89. Defendants argue that collateral estoppel should serve to bar the plaintiff from relitigating the issues raised in his two Article 78 proceedings – that is, whether he was denied procedural due process during the course of the disputed disciplinary proceedings.

### a.   January 12, 1999 Hearing

In his challenge to the January 12, 1999 hearing, plaintiff maintains that he was not permitted to call witnesses and to be present at the hearing. Complaint (Dkt. No. 1) ¶ 69. Those same claims were raised in his state court Article 78 challenge to that hearing determination, Nepveu Decl. (Dkt. No. 97) Exh. C (Rossi Affidavit in Support of Order to Show Cause) ¶¶ 5-8, and were rejected in a decision and order entered by Supreme Court Justice John G. Connor on January 2, 2000, *see id.* Exh. E, and upheld on appeal. *Rossi*, 275 A.D.2d at 824, 713 N.Y.S.2d at 98. On the issue of the plaintiff's failure to appear at the hearing, the Appellate Division specifically made a finding that plaintiff "repeatedly refused attempts to have him leave his cell and would not sign a waiver form", thereby justifying the decision to hold the hearing in his absence. *Id.* As the petitioner in the Article 78 proceeding, plaintiff was presumably

provided a full and fair opportunity in the state courts to litigate the issue

of whether his procedural rights were violated as a result of that

disciplinary hearing.  Based upon the state courts' findings, I recommend

that this court give preclusive effect to those findings and dismiss

plaintiff's due process claims associated with the January 12, 1999

hearing.

b. <u>March 15, 1999 Hearing</u>

Plaintiff's claims surrounding the March 15, 1999 hearing center

upon his contention that "despite evidence to the contrary, [he] was

arbitrarily found guilty of the charges [set forth in the underlying

misbehavior report]".  Complaint (Dkt. No. 1) ¶ 97.  In one of his Article 78

proceedings, plaintiff asserted lack of evidence as a basis for overturning

the March 15, 1999 hearing determination.  *See* Nepveu Decl. (Dkt. No.

97) Exh. K, at 1-2.  Addressing that contention, the Third Department

found "that the detailed misbehavior report and testimony regarding the

incident from the correction officer who authored the report provide the

necessary substantial evidence to support the determination[.]"  *Rossi*,

277 A.D.2d at 615, 716 N.Y.S.2d at 117.  Substantial evidence, in that

context, constitutes "such relevant proof as a reasonable mind may

33

accept as adequate to support a conclusion or ultimate fact." *Bryant v. Coughlin*, 77 N.Y.2d 642, 647, 572 N.E.2d 23, 25, 569 N.Y.S.2d 582, 584 (1991)).  Since this standard appears to be appreciably more demanding than the "some evidence" test applied under *Hill*, the Appellate Division's finding of substantial evidence is entitled to preclusive effect and demonstrates that the challenged hearing determination is supported by at least "some evidence" as constitutionally mandated.  *Alicea v. Howell*, 387 F.Supp.2d 227, 232-33 (W.D.N.Y. 2005).

c.   <u>March 16, 1999 Hearing</u>

In the portion of his complaint addressing the March 16, 1999 disciplinary hearing, plaintiff argues that he was denied the ability to call two requested witnesses.  Complaint (Dkt. No. 1) ¶ 101.  From the brief submitted by plaintiff in support of his Article 78 challenge of that determination, it appears that his inability to call the requested witnesses resulted from their refusal to testify.  Nepveu Decl. (Dkt. No. 97) Exh. K, at 2.  There is an argument to be made that the precise issue now presented was not raised before and decided by the Third Department in connection with plaintiff's Article 78 proceeding.  Nonetheless, since plaintiff's March 16, 1999 disciplinary hearing resulted in only thirty days of keeplock

34

confinement, *see* Nepveu Decl. (Dkt. No. 97) Exh. I, at 1 & Exh. L, at 27, it

did not implicate the deprivation of a liberty interest sufficient to trigger the

Fourteenth Amendment's due process requirements.[17]  *Moore*, 1996 WL

191988, at *1-*3.

d.      April 2 and 20, 1999 Hearings

Plaintiff's claims regarding the two hearings conducted in April of

1999 are similarly unavailing, and subject to dismissal as a matter of law.

As a result of a Tier II April 2, 1999 hearing conducted to address a March

24, 1999 misbehavior report, plaintiff received only fifteen days of

keeplock confinement as a penalty.  Nepveu Decl. (Dkt. No. 97) Exh. K, at

14-26.  Accordingly, that hearing did not implicate a liberty interest

sufficient to trigger the Fourteenth Amendment's due process provisions.

*Dawkins v. Healy*, No. 94 Civ. 6382, 1996 WL 145989, at *1-*3 (S.D.N.Y.

Apr. 1, 1996), *vacated on other grounds*, 1996 WL 280737 (S.D.N.Y. May

28, 1996).  In any event, the claims raised by plaintiff concerning that

hearing – that he was not permitted to present evidence of retaliation, *see*

Complaint (Dkt. No. 1) ¶¶ 106-07 – were presented to and rejected by the

---

[17]      It also appears, as defendants argue, that plaintiff failed to appeal that determination though prescribed, internal channels, and thus did not exhaust available administrative remedies before commencing this action.  *Rosales v. Bennett*, 297 F.Supp.2d 637, 639-40 (W.D.N.Y. 2004).

Appellate Division in connection with one of plaintiff's two Article 78

proceedings.  Nepveu Decl. (Dkt. No. 97) Exh. K, at 12-14; *Rossi*, 277

A.D.2d at 616, 716 N.Y.S.2d at 118.

 The same holds true with regard to the April 20, 1999 Tier II hearing

determination.  In his complaint, plaintiff challenges that determination

based upon his inability to attend, additionally alleging the receipt of

fabricated testimony from prison officials and hearing officer bias

associated with that disciplinary proceeding.  Complaint (Dkt. No. 1) ¶¶

120-26.  These arguments were among a host of claims asserted by the

plaintiff in his second Article 78 proceeding.  Nepveu Decl. (Dkt. No. 97)

Exh. J (Rossi Affidavit in Support of Order to Show Cause) ¶¶ 34-70; *see*

*also id.* Exh. K (Petitioner's Brief), at 24.  In response to those claims the

Third Department found that no evidence of hearing officer bias, and

concluded that the hearing had properly been held in plaintiff's absence.

*Rossi*, 277 A.D.2d at 616, 716 N.Y.S.2d at 117-18.  Plaintiff is therefore

collaterally estopped from relitigating those claims in this forum.

 4. Disciplinary Hearing of January 26, 1999

 Defendants next challenge the portion of plaintiff's complaint

addressing a January 26, 1999 Tier III hearing on charges of assaulting a

fellow inmate, resulting in a finding of guilt and the imposition of a penalty which included 120 days of SHU disciplinary confinement.  In support of his attack upon that proceeding, plaintiff alleges that the proceeding was "exaggerated to a tier III offense for retaliatory reasons" and that fabricated evidence was presented at the hearing.  Complaint (Dkt. No. 1) ¶ 79.  The record does not disclose any deprivation of the procedural rights required before such a disciplinary penalty can be imposed, however, even assuming that a 120 day disciplinary confinement is sufficient to trigger the protections of the Fourteenth Amendment.  The fact that prison officials exercised their judgment to treat the matter as a Tier III violation in and of itself does not implicate any constitutional deprivation, provided the decision was not motivated by retaliatory animus.[18]

     Plaintiff's evidentiary claims arising from the January 29, 1999

---

[18]     Plaintiff suggests that the elevation in seriousness of the disciplinary proceedings was motivated by retaliatory animus.  Plaintiff does not, however, link that retaliation to any specific protected activity, nor does he offer any proof, in opposition to defendants' summary judgment motion, to support a nexus between his protected activity and a decision to treat the charge that he assaulted a fellow inmate as a Tier III offense.  Moreover, as defendants note, the reviewing officer apparently responsible for determining the level offense was Corrections Lieutenant D'Abrogio, who is not named as a defendant in this action.  Any potential retaliation associated with that elevation is thus subject to dismissal as against the defendants in this action based upon the lack of their personal involvement.  *Jackson v. Johnson*, 15 F.Supp.2d 341, 365-66 (S.D.N.Y. 1998).

determination are similarly lacking in support from the record.[19]  Plaintiff's

claim of fabricated evidence appears to address an unusual incident

report in which he was accused of utilizing a weapon.  Complaint (Dkt. No.

1) ¶ 79; *see also* Nepveu Decl. (Dkt. No. 97) Exh. G, at 7.  The record

reflects, however, that the evidence relied upon by the hearing officer in

finding plaintiff guilty of assaulting a fellow inmate by striking him in the

face with his hand did not include the unusual incident report.  *See id.* at

Exh. F, at 3.  Plaintiff also complains regarding alleged discrepancies in

log books regarding whether he punched another inmate in the face.

Nepveu Decl. (Dkt. No. 97) Exh. G, at 3-4.  Plaintiff does not indicate,

however, how this undermines the outcome of the hearing, particularly in

light of his refusal to deny that he did in fact punch a fellow inmate.  *See*

*id.* Exh. G, at 14-15.

        In further support of his due process challenge with regard to that

hearing, plaintiff argues that the hearing officer improperly denied his

request to take the depositions of Donald Selsky, the DOCS Director of

Inmate Discipline/Special Housing; Anthony Antonucci, the DOCS

---

        [19]     The determination stemming from the January 26, 1999 Tier III hearing
was administratively reversed, based upon the hearing officer's failure to properly
document an inmate's refusal to testify at the hearing as requested by the plaintiff.
Nepveu Decl. (Dkt. No. 97) Exh. H.

General Counsel; a psychiatrist; and a witness who was not present during the incident.  *See* Nepveu Decl. (Dkt. No. 97) Exh. F, at 14-15 & Exh. G, at 6-7, 18, 30.  The request that the hearing officer require the production of each of those individuals as witnesses was properly denied, however, based upon his finding that they did not witness the relevant events, and consequently their testimony would be irrelevant to the charges at issue.  *Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999).

Two other witnesses requested by the plaintiff, including the inmate he was charged with assaulting and another prisoner present during the incident, refused to testify at his hearing, and signed forms to that effect. Nepveu Decl. (Dkt. No. 97) Exh. F, at 12-13.  Generally speaking, a hearing officer's determination not to call a witness to testify after his or her refusal to appear willingly "will not constitute a violation of the prisoner's constitutional rights."  *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993); *Shell v. Brezniak*, 365 F.Supp.2d 362, 377 (W.D.N.Y. 2005) (citing *Silva*).  In the absence of proof that the witness's refusal to testify was directly attributable to intimidation on the part of prison officials – a circumstance which is not supported or even suggested by the record in this case – the hearing officer's failure to compel the reluctant inmate to

testify during this hearing did not violate plaintiff's constitutional rights. *See Silva*, 992 F.2d at 22.

### 5.   July 29, 1999 Determination

The last disciplinary proceeding challenged by the plaintiff is that which was completed on July 29, 1999, involving his alleged assault on staff.  Complaint (Dkt. No. 1) ¶¶ 165-66, 178.  Plaintiff maintains that the finding of guilt in connection with those charges was not supported by the evidence in the record.  Complaint (Dkt. No. 1) ¶ 178.

At the conclusion of the hearing on July 29, 1999, hearing officer Decker recited the evidence forming the basis for his finding of guilt, including the misbehavior report; the testimony of Corrections Officer Freer, who authored the report; photographs of Corrections Officer Freer, offered to corroborate that he had suffered injuries consistent with having been kicked in the ribs – one of the allegations against the plaintiff; and a nurse's testimony regarding the corrections officer's injuries.  Nepveu Decl. (Dkt. No. 97) Exhs. P, at 4, 23 & Q, at 94-95.  The hearing officer acknowledged that at the time of the incident staff at the facility's SHU failed to follow established escort procedures, and noted the difficulty in evaluating the case in light of the conflicting accounts offered by Rossi

and the corrections officer involved. *Id.* The hearing officer ultimately

concluded, however, that the evidence supported the charge of assault

upon staff, adding that such conduct is unacceptable and should not be

tolerated particularly in a maximum security SHU, but saw fit to mitigate

the penalty in light of the failure of prison officials to follow proper

procedure. *Id.* Having carefully reviewed the record regarding that

hearing, I find that the hearing result was supported by some evidence.

### 6.   False Misbehavior Reports

Plaintiff also complains of the issuance of two allegedly false

misbehavior reports, authored by Corrections Officer McGuire, regarding

cleaning supplies and the flooding of his cell. Complaint (Dkt. No. 1) ¶ 85.

Plaintiff alleges that the disciplinary charges set forth in those reports,

which were eventually dismissed, were false. To the extent that plaintiff

asserts a claim based upon the fabrication of charges set forth in those

misbehavior reports, such allegations do not rise to a level of

constitutional significance. *Boddie*, 105 F.3d at 862; *Franco*, 854 F.2d at

587-89. And, since those misbehavior reports were ultimately dismissed

and consequently did not result in the deprivation of any cognizable liberty

interest, the allegations regarding their falsity do not support a

41

constitutional claim.  *Benton v. Keane*, 921 F.Supp. 1078, 1078-79
(S.D.N.Y. 1996).

### 7.   Miscellaneous Misbehavior Reports

In addition to the disciplinary charges referred to above, plaintiff's
complaint also mentions in passing other misbehavior reports, including
one issued some time after November 3, 1998, based upon Rossi's
alleged refusal to provide a urine sample, and another on May 26, 1999
for his refusal to surrender handcuffs.  Complaint (Dkt. No. 1) ¶¶ 67, 137.
Because plaintiff provides no further details, and does not make any
specific allegations of constitutional violations resulting from the issuance
of those misbehavior reports, I recommend dismissal of any claims
associated with them.  *Boddie*, 105 F.3d at 862.

### D.   Retaliation

Plaintiff's complaint alleges that the cancellation of a scheduled
appointment for dental cleaning in November of 1998 was motivated by
unlawful retaliation.  Citing evidence in the record firmly establishing that
the cancellation of the dental appointment was the result of plaintiff's
medical TB hold and established DOCS policy providing that routine
medical and dental treatment is not provided to inmates under those

circumstances, defendants assert that plaintiff's retaliation claim is lacking in merit.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

As can be seen, evaluation of claims of retaliation is a particularly

43

fact-laden exercise, since such claims revolve around both the engaging

in protected conduct and establishment of a nexus between that conduct

and the adverse action ultimately taken.  Such claims must also be judged

taking into account the reality that, as the Second Circuit has noted – and

the complaint in this action illustrates – "claims by prisoners that particular

administrative decisions have been made for retaliatory purposes are

prone to abuse," and are easily incanted but far more difficult to

substantiate.  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

In their motion, defendants assert that consistent with the DOCS TB

policy in place at the time, and in order to avoid the possibility of

transmission of undetected TB, plaintiff was required to remain in his cell

except for recreation, showers, legal visits, and medical and dental care.

Nepveu Decl. (Dkt. No. 97) Exh. A.  It is true, as plaintiff argues, that the

DOCS TB policy cited by the defendants does not specifically state that

an inmate on TB medical hold may only receive emergency medical and

dental care.  *See id.*; *see also Ramos v. O'Connell*, 28 F.Supp.2d 796

(W.D.N.Y. 1998) (noting that DOCS TB policy does not establish

parameters governing medical care available to inmates on TB hold and

therefore analyzing claim of denial of dental treatment to abcessed

44

wisdom tooth under Eighth Amendment standards.)  Accordingly, he

argues, the decision to deny him routine dental care was "arbitrary".

Plaintiff's mere disagreement with a decision of this nature, however, does

not alone support a showing of a constitutional retaliation violation.  *Soto*

*v. Iacavino*, No. 01 Civ. 5850, 2003 WL 21281762, at *1 (S.D.N.Y. June 4,

2003).  A review of the documentation associated with the denial of dental

care to the plaintiff reflects that it was a decision made out of concern that

dental staff not be exposed to the possibility of TB infection for a non-

emergency dental visit.  Nepveu Decl. (Dkt. No. 97) Exhs. N, O.  In the

face of this, plaintiff has submitted no evidence of any pretext, nor does

evidence in the record suggest that the decision was not motivated by

legitimate penological concerns, but instead out of retaliatory animus.

Accordingly, I recommend dismissal of plaintiff's retaliation claims

regarding the denial of dental treatment.

     E.    Medical Indifference

    Plaintiff's complaint asserts that his Eighth Amendment right to

remain free from punishment that is cruel and unusual was violated when

medical boots were taken from him following an assault on staff, which

entailed his kicking of Corrections Officer Freer in the ribs.  Complaint

45

(Dkt. No. 1) ¶¶ 164-72.  Plaintiff maintains that this deprivation represented defendants' deliberate indifference to his serious medical needs.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are "incompatible with the evolving standards of decency that mark the progress of a maturing society."[20] *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 290 (1976) (citations and internal quotations omitted); *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia*, *Estelle*).

While the Eighth Amendment "'does not mandate comfortable prisons'", neither does not tolerate inhumane prison conditions; thus the conditions of an inmate's confinement, including medical care, are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  To succeed on a claim alleging that prison conditions, including but not limited to medical care, violate the

---

[20]     That amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

46

Eighth Amendment, a plaintiff must satisfy both an objective and a subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977 (citations and internal quotations omitted); *see also Leach v. Dufrain*, 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (also citing, *inter alia*, *Wilson* ).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'". *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted). A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the

47

unnecessary and wanton infliction of pain'" – since medical conditions

vary in severity, a decision to leave a condition untreated may or may not

be unconstitutional, depending on the facts.  *Harrison v. Barkley*, 219 F.3d

132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*).  Relevant factors

in making this determination include injury that a "'reasonable doctor or

patient would find important and worthy of comment or treatment'", a

condition that "'significantly affects'" a prisoner's daily activities, or

"'chronic and substantial pain.'"  *Chance*, 43 F.3d at 701 (citation omitted).

Deliberate indifference, in a constitutional sense, exists if an official

knows of and disregards an excessive risk to inmate health or safety; the

official must "both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also

draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*,

103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2

(same).

It is well established that mere disagreement with a prescribed

course of treatment, or even a claim that negligence or medical

malpractice has occurred, does not provide a basis to find a violation of

the Eighth Amendment.  *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 201-02;

48

*Chance*, 143 F.3d at 703; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S. Ct. 828 (1992).  Diagnostic techniques and treatments are a "classic example of a matter for medical judgment", and medical staff is vested with broad discretion to determine what method of diagnosis and/or treatment to provide its patients.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp.2d 261, 264 (W.D.N.Y. 1998).

In their motion, defendants assert that plaintiff has failed to establish the existence of a serious medical need of constitutional proportions. Having carefully reviewed the record in the light of plaintiff's position to the motion, I can find no evidence that plaintiff suffered from a foot problem producing or likely to produce "death, degeneration, or extreme pain". *Chatin v. Artuz*, No. 95 Civ. 7994, 1999 WL 587885, at *3 (S.D.N.Y. Aug. 4, 1999).  I am also unable to conclude that defendants acted with deliberate indifference to any such need, since when plaintiff's medical boots were taken away he was provided with substitute orthotics for his sneakers, with a physician noting that they were adequate to address plaintiff's medical needs while incarcerated in the SHU, where he was not

49

required to do any extended walking.  *See* Nepveu Decl. (Dkt. No. 97)

Exh. S, at 5.  I therefore recommend dismissal of plaintiff's deliberate

indifference claim as a matter of law, based upon his failure to offer proof

of either the existence of a constitutionally significant serious medical

need or deliberate indifference on the part of any named defendant to

such a need.

G.    Personal Involvement

The final element of defendants' motion seeks dismissal of plaintiff's

claims against Commissioner Goord, based upon lack of personal

involvement.  In support of that request defendants argue that the sole

reference in plaintiff's complaint to the Commissioner surrounds his

alleged failure to answer letters sent to him by Rossi regarding the various

matters addressed in his complaint.  *See*, *e.g.*, Complaint (Dkt. No. 1) ¶¶

76, 105, 134.

Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983.

*Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of*

*Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson*,

568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct.

1282 (1978)).  In order to prevail on a section 1983 cause of action

against an individual, a plaintiff must show some tangible connection

between the constitutional violation alleged and that particular defendant.

*See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

A supervisor cannot be liable for damages under section 1983 solely

by virtue of being a supervisor – there is no *respondeat superior* liability

under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.

2003); *Wright*, 21 F.3d at 501.  A supervisory official can, however, be

liable in one of several ways: 1) the supervisor may have directly

participated in the challenged conduct; 2) the supervisor, after learning of

the violation through a report or appeal, may have failed to remedy the

wrong; 3) the supervisor may have created or allowed to continue a policy

or custom under which unconstitutional practices occurred; 4) the

supervisor may have been grossly negligent in managing the subordinates

who caused the unlawful event; or 5) the supervisor may have failed to act

on information indicating that unconstitutional acts were occurring.

*Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*,

781 F.2d 319, 323-24 (2d Cir. 1986).

It is true, as defendants argue, that the mere sending of unanswered

51

letters to the Commissioner does not implicate his personal involvement in the constitutional violations detailed in those letters. *Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) (citing, *inter alia*, *Garrido v. Coughlin*, 716 F.Supp. 98, 100 (S.D.N.Y. 1989)). Plaintiff's complaint goes further, however, asserting that on at least one occasion Commissioner Goord affirmatively acted in denying a request made by him. *See* Complaint (Dkt. No. 1) ¶ 41. Such an allegation, if substantiated, could implicate the Commissioner in the particular violation referenced in the letter. *Walker v. Pataro*, No. 99Civ.4607, 2002 WL 664040, at *12-*14 (S.D.N.Y. Apr. 23, 2002). That letter, however, relates to plaintiff's religious objections to his TB testing. Since that is an issue which no longer remains in the case, I recommend that defendants' motion for summary judgment dismissing plaintiff's complaint with respect to Commissioner Goord be granted.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

_____Plaintiff's complaint challenges the issuance of several misbehavior reports and resulting disciplinary proceedings against him. Because those various proceedings either do not implicate the deprivation of a constitutionally significant liberty interest and/or plaintiff is barred by

collateral estoppel from relitigating those claims, based upon his unsuccessful state court challenges to those proceedings, I recommend dismissal of plaintiff's procedural due process claims.

Plaintiff has also asserted that his procedural process rights were violated when he was placed in medical keeplock confinement for one year for refusing to be tested for TB. Because that confinement was accompanied by notice of the governing DOCS policy and adequate opportunity for plaintiff to be heard, his due process rights were not infringed as a result of the TB hold.

Plaintiff's medical indifference claims related to the taking of his boots, following an incident involving his kicking of a corrections officer, does not implicate a serious medical need, nor does it stem from any deliberate indifference to such a medical need. I therefore recommend dismissal of that claim as well. I further recommend dismissal of all claims in this action against defendant Goord, based upon lack of personal involvement.

Based upon the foregoing, I recommend dismissal of all claims asserted by the plaintiff in his diverse and multi-faceted complaint with the exception of those related to his allegation that his food was tampered

with and he was denied nutritionally adequate meals between April 5, 1999 and May 10, 1999, involving allegations made in paragraphs 117, 130-33 and 135 of plaintiff's complaint.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for partial summary judgment dismissing portions of plaintiff's claims be GRANTED.  Based upon this recommendation, if accepted, the causes of action which will remain in this case for trial include plaintiff's food tampering and insufficient nutritional intake claims, implicating only defendants Lutz, Decker and Annetts.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.  Fed. R. Civ. P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citations omitted); and it is further hereby

ORDERED, that the Clerk serve a copy of this report and
recommendation on the plaintiff by regular mail and defendants' counsel
via electronic means.

IT IS SO ORDERED.

David E. Peebles
U.S. Magistrate Judge

Dated:      March 27, 2006
            Syracuse, NY